Adam R. Alper (SBN 196834)
Reza Dokhanchy (SBN 287684)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, California 94104
adam.alper@kirkland.com
reza.dokhanchy@kirkland.com
Telephone: (415) 439-1400
Facsimile: (415) 439-1500

Michael W. De Vries (SBN 211001)
KIRKLAND & ELLIS LLP
555 South Flower Street, Suite 3700
Los Angeles, California 90071
michael.devries@kirkland.com
Telephone: (213) 680-8400
Facsimile: (213) 680-8500

Attorneys for Plaintiff
ALLROUNDS, INC.

*[Additional counsel listed on signature page]*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALLROUNDS, INC., | CASE NO. |
| Plaintiff, | **COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| ESHARES, INC. D/B/A/ CARTA, INC., CARTA CAPITAL MARKETS, LLC, CARTA SECURITIES, LLC, DFJ MANAGEMENT, LLC, THRESHOLD MANAGEMENT LLC, DFJ GROWTH MANAGEMENT, LLC, DRAPER FISHER JURVETSON MERCURY VENTURE PARTNERS, L.P., AND DRAPER ASSOCIATES, L.P., | |
| Defendants. | |

## COMPLAINT

Plaintiff AllRounds, Inc. ("AllRounds" or "Plaintiff") alleges as follows against Defendants DFJ Management, LLC ("DFJ"), Threshold Management, LLC ("Threshold Management"), DFJ Growth Management, LLC ("DFJ Growth"), Draper Fisher Jurvetson Mercury Venture Partners, L.P. ("DFJ Mercury"), Draper Associates, L.P. ("Draper Associates") (collectively, the "Draper VC Entities"), and eShares, Inc. d/b/a/ Carta, Inc., Carta Capital Markets, LLC, and Carta Securities, LLC (collectively, "Carta") (along with the Draper VC Entities, collectively, the "Defendants"). The allegations herein are made based on personal knowledge as to AllRounds with respect to its own actions, and upon information and belief as to all other matters.

## INTRODUCTION

1.     Founded by entrepreneur Jamie Cohan, AllRounds conceived of and built the world's first comprehensive private capital management software platform.   Based on the market experience and ingenuity of its founder, and through extensive research and development, AllRounds became the first company to offer a scalable, customizable, and accurate software solution that manages the entire workflow of the private investment world.

2.     Through his many years of experience in the world of private investment, in the early 2000s, Mr. Cohan discovered significant flaws with the traditional methods for creating financial models concerning privately held companies, accessing those models and attendant data by managers at those companies, and sharing that information with investors.  As Mr. Cohan discovered, financial data was unreliable and riddled with human error, and what financial data did exist was largely unavailable to outside investors, who would benefit from access to it.  These disadvantages led to great inefficiencies in the ways companies managed their finances and how investing in private companies occurred.  To address these and other deficiencies, over the course of years, Mr. Cohan developed a software technology platform that was expansive and comprehensive, while remaining intuitive and easy to use.  The resulting AllRounds technology platform provided a private capital management solution to all entities involved in the private capital world—whether they are privately held companies, individual investors, private equity firms, venture capital firms, or associated service firms such as law firms, accounting firms, or valuation service firms.

3.       It was not long before others took notice of Mr. Cohan's technological innovations and became interested in the AllRounds software.  This included the Draper VC Entities, who recognized the power of AllRounds' technologies, commenting that "AllRounds has a very impressive product that [] will successfully revolutionize how we use financial info in the venture ecosystem."  However, unbeknownst to Mr. Cohan at the time, it would be those very people that Mr. Cohan trusted with AllRounds' confidential information that would be the ones to illegally use Mr. Cohan's technologies against him, to develop a competing product and attempt to put AllRounds out of business.

4.       Unlike AllRounds, Defendant Carta did not innovate on its own.  At the time Mr. Cohan was developing and deploying the AllRounds software to its customers, Defendant Carta had a simple, low-margin and low-tech business of converting paper stock certificates into digital ones.  However, in connection with bringing on AllRounds' former customer as a key investor—the Draper venture capital firm who had acquired AllRounds' trade secrets and agreed to keep them secret—Carta went from a simple stock certificate company to one that had AllRounds squarely in its sights.  This was no coincidence: the Defendants, armed with their knowledge of AllRounds technologies and with AllRounds trade secrets in hand, conspired to provide AllRounds' trade secret technologies to Carta, to enable Carta to release a competing software product almost identical to AllRounds.  Knowing that Mr. Cohan's technologies would spark a revolution in the private investment world, Defendants planned to promote their version of AllRounds' technologies, cutting AllRounds out of its own technologies, and taking all the credit.  One need not look far to see Defendants' motives for their illegal acts:  thus far, Carta has reaped hundreds of millions of dollars directly attributable to Mr. Cohan's technologies, and its once sleepy business is now valued at over $3 billion.

5.       The misappropriation continues to this day, as Carta continues to sell its misappropriated software and continues to release new software based on Mr. Cohan's trade secret technologies.  The Defendants stole not only AllRounds' software trade secrets, but also its business plans and market insights, which enabled them to become the dominant force in this winner-take-all market.  Acknowledging the illegality of their acts, and in further abject indifference to Mr. Cohan's rights, Defendants went to great lengths to conceal their scheme to misappropriate AllRounds' trade

secrets, including telling Mr. Cohan that they believed there was no market for the technology, while simultaneously building a competing platform using his trade secrets.

6.      At all times, the Defendants knew that the technology they were using to develop the Carta platform not only constituted AllRounds' trade secrets, but also that aspects of the technology infringed AllRounds patent rights.  The Defendants further understood the confidentiality obligations owed to AllRounds, yet proceeded to unlawfully use AllRounds' trade secret technology, business plans, and market insight, and continue to do so to this day.

7.      The Defendants' misappropriation of trade secrets and Carta's infringement of AllRounds' patents leave AllRounds no choice but to file this lawsuit seeking injunctive relief and recovery of damages for the harm that has been caused by the Defendants' unlawful conduct. The Defendants did not compete fairly with AllRounds—they, through the Draper firm, developed a relationship of trust with AllRounds, then blatantly stole AllRounds' trade secrets and copied AllRounds' proprietary technologies in order to take a shortcut to the marketplace. Such conduct deters investments in technology, harms entrepreneurship, and damages the economy in critical ways. Unless halted, the Defendants' illegal actions will encourage other companies who have not invested in research and development themselves to steal the trade secrets and violate the intellectual property rights of true innovators and entrepreneurs.

8.      For these reasons and as alleged in detail below, AllRounds brings this action against Defendants for trade secret misappropriation, in violation of the Defend Trade Secret Act, 18 U.S.C. § 1836, *et seq.* and California Uniform Trade Secret Act, Cal. Civ. Code § 3246, *et seq.*, and for patent infringement.

## THE PARTIES

9.      AllRounds, Inc. is a company organized and existing under the laws of California having a principal place of business in Tiburon, California, with its mailing address at 548 Market Street, Suite 95255, San Francisco, California 94104.

10.      Defendant DFJ Management, LLC ("DFJ") is a company, formerly known as Draper Fisher Jurvetson Management, LLC, organized and existing under the laws of California, with its principal place of business at 2882 Sand Hill Road, Menlo Park, California 94025.  DFJ also does

business under at least the following names: Draper Fisher Jurvetson; Threshold Ventures I General Partner LLC; Threshold Ventures I Management Company, LLC; Draper Fisher Jurveston Management Company VI, LLC; Draper Fisher Jurveston Fund VII Partners, L.P.; Draper Fisher Jurveston Fund VII Management Company, LLC; Draper Fisher Jurveston Fund VIII Partners, L.P.; Draper Fisher Jurveston Fund VIII Management Company, LLC; Draper Fisher Jurveston Fund IX Partners L.P.; Draper Fisher Jurveston Fund IX Management Company, LLC; Draper Fisher Jurveston Fund X Partners, L.P.; Draper Fisher Jurveston Fund X Management Company, LLC; Draper Fisher Jurveston Fund XI Partners, L.P.; Draper Fisher Jurveston Fund XI Management Company, LLC; Threshold Ventures II Management Company, LLC; Threshold Ventures II General Partner, LLC; Threshold Ventures I Partners Fund, LLC; Draper Fisher Jurveston Partners IX, LLC; Draper Fisher Jurveston Partners VI, LLC; Draper Fisher Jurveston Partners VII, LLC; Draper Fisher Jurveston Partners VIII, LLC; Draper Fisher Jurveston Partners X, LLC; Threshold Ventures I Partners Fund, LLC; Threshold Ventures I, L.P.; Threshold Ventures II Partners Fund, LLC; Threshold Ventures II, L.P.; DFJ Fund VII; DFJ Fund VIII; DFJ Fund IX; DFJ Venture; DFJ Ventures; Draper Fisher Jurvetson Venture Partners, L.P.; Draper Fisher Jurveston Management Company V, LLC; Draper Fisher Management Company, LLC.

11.    Defendant Threshold Management LLC ("Threshold Management") is a company, formerly known as DFJ Venture, organized and existing under the laws of California, with its principal place of business at 2882 Sand Hill Road, Suite 150, Menlo Park, California 94025.  Threshold Management also does business under at least the following names: Threshold Ventures; Threshold Ventures III General Partner, LLC; Threshold Ventures III, L.P.

12.    Defendant DFJ Growth Management, LLC ("DFJ Growth") is a company organized and existing under the laws of California, with its principal place of business at 2882 Sand Hill Rd Suite 150, Menlo Park, California 94025.

13.    Defendant Draper Fisher Jurvetson Mercury Venture Partners, L.P. ("DFJ Mercury") is a company organized and existing under the laws of Delaware, with its principal place of business at 3737 Buffalo Speedway, Suite 1750, Houston, Texas 77098.

14.     Defendant Draper Associates, L.P. ("Draper Associates") is a company organized and existing under the laws of California, with its principal place of business at 55 East 3rd Avenue, San Mateo, California 94401.

15.     In connection with the unlawful acts alleged herein, the Draper VC Entities have acted in concert with each other, as each other's agents and/or affiliates, and have held themselves out to AllRounds as being closely intertwined, operating under common authority, and acting as each other's alter egos, including as alleged herein.

16.     Defendant eShares, Inc. ("eShares") d/b/a/ Carta, Inc. is a company organized and existing under the laws of Delaware, with its principal place of business at 195 Page Mill Road Suite 101, Palo Alto, California 94306.

17.     Defendant Carta Capital Markets, LLC is a company organized and existing under the laws of Delaware, with its principal place of business at One World Trade Center, 81st Floor, New York, New York 10007, and a California office at 333 Bush St. 23rd Floor, Suite 2300, San Francisco, California 94104.

18.     Defendant Carta Securities, LLC is a company organized and existing under the laws of Delaware, with its principal place of business at 600 Harrison Street, Suite 120, San Francisco, California 94107.  Carta Securities, LLC also conducts business under at least the name eShares Securities, LLC.

19.     Defendants eShares, Inc. d/b/a/ Carta, Inc., Carta Securities, LLC, and Carta Capital Markets, LLC are referred to herein collectively as "Carta."

## JURISDICTION

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 2201, 2202, the trade secret laws of the United States (18 U.S.C. §§ 1836 and 1839), and the Federal Patent Act, 35 U.S.C. § 101 *et seq.*  This Court also has supplemental jurisdiction over the asserted state law claims pursuant to 28 U.S.C. § 1367(a) because the federal and state law claims derive from a common nucleus of operative facts.

21.     This Court has personal jurisdiction over all of the Defendants.  Personal jurisdiction exists generally and specifically over all of the Defendants because they (directly and/or through their

subsidiaries, divisions, groups or distributors) have sufficient minimum contacts with the Northern District of California as a result of substantial business conducted within the State of California.

22.     Personal jurisdiction also exists specifically over all the Defendants because they have each committed acts of misappropriation, and, additionally Carta has committed acts of patent infringement, in this District and the State of California, because Carta directly and/or through its subsidiaries, divisions, groups, or distributors, advertises, markets, uses, offers for sale, imports for sale and/or sells the products at issue in this case containing the misappropriated technology in this District and the State of California, and places those products in the stream of commerce with the expectation and knowledge that they will be purchased by consumers in this district.

## VENUE

23.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b), 1400(a) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district, and a substantial part of property that is the subject of the action is situated in this judicial district.  Further, Carta has committed acts of patent infringement in this judicial district and has a principal place of business in in this judicial district, as described above, and therefore has a regular and established place of business in this judicial district.  Moreover, all Defendants committed acts of trade secret misappropriation in this judicial district.  Lastly, all Defendants except for DFJ Mercury have a principal place of business or offices in which they regularly conduct business in this judicial district.

## INTRADISTRICT ASSIGNMENT

24.     This is an action regarding intellectual property rights and therefore excluded from the division-specific venue rule, pursuant to L.R. 3-2(c).

## ADDITIONAL FACTUAL ALLEGATIONS

### A.     AllRounds' Trade Secret Technologies

25.     As described above, Mr. Cohan recognized significant problems with the way computer-based private capital and internal finance operated in the early-to-mid 2000s.  Using his knowledge concerning those industries and of computer programming, he developed his innovative technologies directed at addressing those problems, which revolutionized the way private companies and their investors do business.  One way that AllRounds pioneered private capital management was

by innovating a technology system and a method that use intelligently-designed and comprehensive software accessible to a plurality of users through a communication network, such as the Internet. The software facilitates pre-financing and post-financing interactions between the users, which may be, for example, companies and investors, throughout one or more "rounds" of financing. This innovation greatly reduces deadweight loss and uncaptured value that existed in prior software solutions due to the lack of a standard process for exchanging securities, lack of transparent information, lack of continuous valuation ability, and lack of a critical mass of investors.

26. Respecting intellectual property rights is important to AllRounds, and AllRounds protected its technological innovations in a number of ways.

27. For example, AllRounds maintained many of its technological innovations as trade secrets. Many of these trade secrets focused on three primary components of AllRounds' innovative platform: (1) technological functionality for private companies to manage their own finances; (2) technological functionality for investors to manage investments, including in those companies; and (3) technological capabilities to allow the company and investor sides of its software to integrate in a unique and innovative way.

28. AllRounds' trade secrets relating to its technologies for private companies concern the design and implementation of a hardware and software platform that creates a comprehensive picture of a company's financing and capitalization, using advanced mathematical tools and synthesizing a greater number of data sources than ever before possible to create a fully-informed system that is easier to manage, far less prone to human error, and far more flexible, dynamic, and scalable as a company grows and changes over time.

29. AllRounds' trade secrets relating to its technologies for venture capital and other investors concern the design and implementation of a hardware and software platform that provides visibility into financial performance of investments and a greater ability to track and manage one's stake in a given company in a way that greatly reduces management overhead and mitigates error. AllRounds' integration of the company and investor sides of its platform involves additional trade secrets concerning the design and implementation of that integration, and its use to enable a new world of private security trading.

30.     The particular combination of features AllRounds chose to include in its software, and the look and feel of those features also reflect years of research and development, as well as Mr. Cohan extensive experience in the industry and his ingenuity, which made AllRounds platform unlike any other financial and capital management software.

**B.     AllRounds Diligently Protects Its Trade Secrets and Confidential Information**

31.     AllRounds has expended considerable resources in research and development, which resulted in volumes of confidential technical trade secrets. AllRounds has also committed a significant amount of resources in developing its business plans and market insight, which led to additional proprietary trade secrets.  In particular, significant aspects of AllRounds' products and business are highly confidential, and are maintained by AllRounds in strict confidence as trade secrets to protect their value and the substantial investments AllRounds has made to develop them.  Indeed, this confidential information derives considerable value from not being publicly known outside of AllRounds.

32.     After experiencing first-hand the challenges associated with funding technology companies in the late 1990s and early 2000s, Mr. Cohan founded AllRounds in 2007.  The development of AllRounds' trade secret technologies required Mr. Cohan to make substantial capital investments, and expend thousands of person hours on software development and testing.

33.     AllRounds has acted reasonably and diligently to protect the secrecy of its trade secret and confidential information, including by the following measures:

- Securing access to the premises of its headquarters;
- Requiring employees to sign non-disclosure / confidentiality agreements;
- Protecting the AllRounds software by password, which is only able to be created and distributed by AllRounds employees;
- Storing AllRounds confidential source code information on secure, password-protected servers that only AllRounds research and development staff have access to;
- Performing exit interviews in which AllRounds' managers discuss the continuing nature of one's duties of confidentiality to AllRounds, as well as detailed questions about return of company documents, diligently seeking return of its property including its trade secret and confidential information;
- Requiring that employees reaffirm their confidentiality, non-disclosure, employee non-solicitation and return of property obligations upon termination of employment;
- Sharing information with potential customers and investors with strict expectation of confidentiality;

COMPLAINT                                          8

- Labeling confidential material with a designation indicating its confidential nature where practicable; and
- Requiring customers to sign a non-disclosure / confidentiality agreement before obtaining access to the AllRounds software.

### C.  AllRounds' Patented Technologies

34.     In addition to protecting its technologies through trade secret protection, AllRounds also protected certain other of its technologies through patents.  In particular, AllRounds applied for and obtained two U.S. patents.  United States Patent No. 8,046,295 (the "'295 patent"), entitled "Private Capital Management System and Method," issued on October 25, 2011 to inventor James Anthony Cohan.  A true and correct copy of AllRounds' '295 patent is attached as Exhibit A. AllRounds is the owner and sign assignee of the '295 patent and has the full right to enforce and/or license the '295 patent.  The '295 patent is valid and enforceable.  United States Patent No. 8,374,954 (the "'954 patent"), with the same title, issued on February 12, 2013 to the same inventor.  A true and correct copy of AllRounds' '954 patent is attached as Exhibit B. AllRounds is the owner and sign assignee of the '954 patent and has the full right to enforce and/or license the '954 patent.  The '954 patent is valid and enforceable.

### D.  The Draper VC Entities Acquired Extensive AllRounds Trade Secrets

35.     Upon learning about AllRounds' groundbreaking technologies, the Draper VC Entities were immediately interested.  As to DFJ, in or around April 2010, AllRounds' Vice President of Sales, Rizwan Hussain ("Hussain") connected with Marta Bulaich ("Bulaich") of DFJ.  Bulaich was responsible for coordinating among affiliates of DFJ and the various Draper VC Entities on behalf of DFJ.

36.     DFJ was very interested in what AllRounds had to offer, and so about one week later, on or around June 18, 2010, AllRounds had a kickoff meeting with Mark Greenstein ("Greenstein"), CFO of DFJ, and Bulaich.  During the meeting, the DFJ representatives stated they would introduce AllRounds to Draper Associates, DFJ Growth, and DFJ Mercury, and proceeded to do so.

37.     On or around July 15, 2010, Draper Associates partner Joel Yarmon ("Yarmon") emailed Valerie Milligan ("Milligan"), executive assistant to Mark Bailey ("Bailey"), partner at DFJ Growth, encouraging DFJ Growth to adopt AllRounds products.

38.     On or around March 17, 2011, DFJ Growth entered into the AllRounds Master Subscription Agreement ("MSA"), formally becoming an AllRounds' customer.  AllRounds provided its proprietary system including AllRounds trade secrets to DFJ Growth and continued working closely with DFJ Growth.  The recipients of AllRounds' confidential information included partners, executive assistants, associates, and IT personnel.

39.     On or around March 6, 2012, DFJ Mercury entered into the AllRounds MSA and formally became an AllRounds' customer.  AllRounds provided its proprietary system, including AllRounds trade secrets, to DFJ Mercury and continued working closely with DFJ Mercury. AllRounds' technology proved to be critically valuable as AllRounds' proprietary products and features identified major inconsistencies in DFJ Mercury's financial information multiple times. The recipients of AllRounds' confidential information involved the CFO, the managing partner, and the director of financial reporting.

40.     On or around March 6, 2012, DFJ Mercury's MSA was amended to add access for Draper Fisher Jurvetson Venture Partners, L.P.  Pursuant to the Amendment, DFJ Venture had full access to AllRounds' system, and did access the system, including AllRounds' trade secrets, and promised to keep such information confidential.

41.     The Draper VC Entities agreed, via the MSA, that neither the Draper VC Entities nor their affiliates would, *inter alia,* make improper use of any of AllRounds' confidential information, and would not disclose or use any AllRounds confidential information outside the scope of the agreement.  Additionally, AllRounds always stressed to recipients of its confidential information, including its trade secrets, that it regarded such information as confidential, and the recipients of that information verbally assented that they were keep the information confidential.

42.     On or around September 3, 2013, Tim Draper, head of the Draper VC Entities, emailed Mr. Cohan to schedule a meeting ostensibly to discuss the possibility of the Draper VC Entities investing in AllRounds.  Unbeknownst to AllRounds and Mr. Cohan, just a month earlier, the Draper VC Entities had already invested in eShares, soon to be renamed Carta, and were in actuality seeking to continue to extract as much proprietary trade secret information from AllRounds as possible before abandoning it and developing a competing product with eShares/Carta.

43.     The meeting took place on or around September 17, 2013.  During the meeting, AllRounds met with Tim Draper, discussed AllRounds' business strategy, and demonstrated AllRounds' latest product functionalities.  AllRounds explained to Mr. Draper that AllRounds' products and the presentation contained confidential  information including AllRounds trade secrets, and that AllRounds had also obtained the '295 patent.  Two days after the meeting, on or around September 19, 2013, Tim Draper emailed Mr. Cohan, stating that AllRounds' technology "is cool and mission critical for us."

44.     On or around October 1, 2013, Tim Draper again asked AllRounds to meet, this time with DFJ's CFO Mark Greenstein and partner Josh Stein.  The meeting took place on or around October 9, 2013.

45.     After that meeting, and once the Draper VC Entities had taken everything they could from AllRounds, the Draper VC entities cut and ran.  On or around October 13, 2013, Tim Draper informed AllRounds that DFJ would not invest in AllRounds due to "market size issues."  Again, just two months prior, the Draper VC Entities had invested in eShares/Carta, whereby the two companies would conspire to enter that very market using AllRounds' trade secrets.  On or around October 30, 2013, Mr. Cohan emailed Tim Draper, seeking an introduction to AngeList, which DFJ was invested in.  For the first time during the several years that AllRounds had been communicating with the Draper VC Entities, Tim Draper did not reply.  On or around December 30, 2013, DFJ Growth and DFJ Mercury terminated their customer relationships with AllRounds.

**E.     Carta Enters the Private Capital Management Market Only After Being Provided With AllRounds' Trade Secret Information**

46.     Founded in July 2012, eShares (later renamed "Carta") provided a low-margin and low-tech, commodity service whereby eShares converted paper stock certificates to electronic stock certificates.     https://web.archive.org/web/20131010031325/https://www.esharesinc.com.     Before eShares obtained AllRounds' trade secret information, its simple product was drastically different from what its comprehensive financial software offerings would later become.

47.     With AllRounds' proprietary trade secret information in hand from years of confidential discussion and use of the AllRounds products under confidentiality agreements, the

Draper VC Entities invested in the "seed" round of financing for eShares via DFJ on or around August 13, 2013.  As they acquired everything they could from AllRounds, after years of close communication and confidential disclosures, the Draper VC Entities took those trade secrets to eShares, and the transformation of eShares into an AllRounds copycat began.

48.     In November 2013, eShares announced it would introduce a cap table management product, a drastic deviation from its basic digital stock certificate conversion offerings. https://web.archive.org/web/20140306064440/http:/vator.tv/news/2013-11-21-splash-sf-oct-2013-finalist-eshares.  Even then, as eShares acknowledged, eShares' cap table management product was a much narrower offering than the comprehensive private capital management platform that AllRounds developed.   https://carta.com/blog/eshares-is-now-carta/ ("The investor criticism of eShares has always been 'how big can the cap table market be?'  It turns out much bigger than people thought."). Yet Carta was actively and surreptitiously copying AllRounds trade secrets, to offer the broader and highly innovative platform that had been developed by AllRounds.

49.     Accordingly, Carta thereafter further pivoted its business into additional private capital management features based on AllRounds patented technologies and trade secrets.  This included Carta for Private Companies and Carta for Venture Capital.  This also included CartaX, an exchange platform based on AllRounds' patented technologies and trade secrets.  By misappropriating AllRounds' trade secrets, Carta gained entry into a market that it had no ability to enter before acquiring that information, thereby transforming its once-sleepy business into a multi-billion-dollar juggernaut that is seen as the future of the private capital market world, just as AllRounds was when it was discovered by the Draper VC Entities.

50.     The Draper VC Entities via Draper Associates further invested in Carta's Series B financing round on or around July 12, 2015, loaned funds to Carta via convertible note on or around February 13, 2017, invested in Carta's Series C financing round on or around October 11, 2017, invested in Carta's Series C prime financing round on or around January 30, 2018, invested in Carta's Series D financing round on or around December 26, 2018, invested in Carta's Series E financing round on or around May 6, 2019, and invested in Carta's Series F financing round on or around May 10, 2020.

51.     On   or   around   November   6,   2017,   eShares   renamed   itself   "Carta." https://carta.com/blog/eshares-is-now-carta/.

52.     Carta's software technologies and business strategies are nearly identical to those of AllRounds.   When viewed in context with AllRounds' innovative technologies, Carta's use of AllRounds' intellectual property is undeniable, as is its focus on them as a company, as indicated by its descriptions of its products and its CEO's discussion of its business plans, both past and future. https://techcrunch.com/2019/05/06/carta-was-just-valued-at-1-7-billion-by-andreessen-horowitz-in-a-deal-some-see-as-rich/.

53.     Following its most recent round of Series F preferred stock financing which closed on or around May 10, 2020, Carta is reported to have a "post-money" valuation of over $3.2 billion.   https://westcoast.partners/portfolio_type/carta/.

**COUNT I**

**Trade Secret Misappropriation Under The Defend**
**Trade Secrets Act, 18 U.S.C. §§ 1836(b), 1839 *et seq.***
**(Against All Defendants)**

54.     AllRounds re-alleges and incorporates by reference the allegations above as though fully set forth herein.

55.     AllRounds' trade secret and confidential information relates to products or services used, sold, purchased, or transported, or intended for use, sale, purchase, or transport, across the country and throughout the world.

56.     AllRounds is the owner of trade secret and confidential information, that as described above, constitute "trade secrets" within the meaning of 18 U.S.C. § 1839(3).

57.     The above detailed trade secret and confidential information that Defendants accessed, used, copied, and shared derives independent economic value, both actual and potential, from not being generally known to and not being readily ascertainable through proper means by AllRounds' competitors, including Carta, or to other persons or entities who might obtain economic value from their disclosure or use.

58.     At all times relevant herein, AllRounds has taken the above-described reasonable measures to protect the secrecy of its trade secret and confidential information, including that which Defendants have misappropriated.

59.     The Draper VC Entities gained access to AllRounds' trade secrets under non-disclosure and confidentiality agreements.

60.     The Draper VC Entities subsequently used and disclosed to Carta AllRounds' trade secrets. Carta conspired with Draper VC Entities to steal AllRounds' trade secret technologies and soon thereafter released a competing software platform almost identical to AllRounds.  At all relevant times, Defendants were aware that Draper VC Entities had obligations to AllRounds to refrain from taking AllRounds' trade secrets.

61.     Defendants improperly acquired AllRounds' trade secrets and have since improperly used and disclosed those trade secrets, including by incorporating them into products Carta developed as its own.

62.     Defendants' actions, as set forth herein, constitute "misappropriation" within the meaning of 18 U.S.C. § 1839(5).

63.     Defendants accessed, used, copied, and shared AllRounds' trade secret and confidential information by improper means, without AllRounds' express or implied consent.

64.     Defendants knew or had reason to know at the time they accessed, used, copied, and/or shared AllRounds' trade secret and confidential information that this information was acquired and maintained by improper means and/or under circumstances giving rise to a duty to maintain secrecy or limit use.

65.     Defendants are retaining and using AllRounds' trade secret and confidential information to compete with and/or otherwise harm AllRounds.  As alleged herein, Defendants committed numerous acts in furtherance of its misappropriation in the United States and in this District, including misappropriating trade secrets that it obtained and/or originated from this District with knowledge and intent to harm AllRounds in this District, as well as attempting to sell and/or selling (and/or facilitating selling) products in the U.S. and this District that benefit from Defendants' theft.

66.     Defendants' misappropriation has proximately caused damage to AllRounds, including but not limited to loss of profits, goodwill, competitive advantage and business opportunities.

67.     Defendants have been unjustly enriched as a further proximate result of its misappropriation of AllRounds' trade secret and confidential information.

68.     Defendants' actions in misappropriating AllRounds' trade secret and confidential information were willful, fraudulent, malicious, and was done with the intent to injure and oppress AllRounds and improve Defendants' own economic opportunities, thereby justifying an award of punitive damages against Defendants pursuant to 18 U.S.C. § 1836(b)(3)(C) and attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3)(D).

69.     AllRounds is also entitled to temporary, preliminary, and permanent injunctive relief to protect its confidential information and trade secrets by 1) enjoining Defendants from using or disclosing AllRounds' trade secret and confidential information; 2) enjoining Defendants from altering or deleting AllRounds' trade secret and confidential information; and 3) requiring Defendants to turn over any and all copies of AllRounds' trade secret and confidential information to AllRounds.

## COUNT II

**Trade Secret Misappropriation Under The California Uniform
Trade Secret Act, Cal. Civ. Code § 3426 *et seq.*
(Against All Defendants)**

70.     AllRounds re-alleges and incorporates by reference the allegations above as though fully set forth herein.

71.     AllRounds is the owner of trade secret and confidential information, that as described above, constitute "trade secrets" within the meaning of Cal. Civil Code § 3426.1.

72.     The above detailed trade secret and confidential information that Defendants accessed, used, copied, and shared derives independent economic value, both actual and potential, from not being generally known to and not being readily ascertainable through proper means by AllRounds' competitors, including Carta, or to other persons or entities who might obtain economic value from its disclosure or use.

73.     At all times relevant herein, AllRounds has taken the above-described reasonable measures to protect the secrecy of trade secret and confidential information, including that which Defendants has misappropriated.

74.     The Draper VC Entities gained access to AllRounds' trade secrets under non-disclosure and confidentiality agreements.

75.     The Draper VC Entities subsequently used and disclosed to Carta AllRounds' trade secrets. Carta conspired with Draper VC Entities to steal AllRounds' trade secret technologies and soon thereafter released a competing product almost identical to AllRounds.  At all relevant times, Defendants were aware that Draper VC Entities had obligations to AllRounds to refrain from taking AllRounds' trade secrets.

76.     Defendants improperly acquired AllRounds' trade secrets and have since improperly used and disclosed those trade secrets, including by incorporating them into products Defendants develops as its own.

77.     Defendants' actions, as set forth herein, constitute "misappropriation" within the meaning of Cal. Civil Code § 3426.1.

78.     Defendants accessed, used, copied, and shared AllRounds' trade secret and confidential information by improper means, without AllRounds' express or implied consent.

79.     Defendants knew or had reason to know at the time they accessed, used, copied, and/or shared AllRounds' trade secret and confidential information that this information was acquired and maintained by improper means and/or under circumstances giving rise to a duty to maintain its secrecy or limit its use.

80.     Defendants has failed to return to AllRounds the trade secret and confidential information that it misappropriated.

81.     Defendants is retaining and using AllRounds' trade secret and confidential information to compete with and/or otherwise harm AllRounds.

82.     Defendants' misappropriation proximately caused damages to AllRounds, including but not limited to loss of profits, goodwill, competitive advantage and business opportunities.

83.     Defendants has been unjustly enriched as a further proximate result of its misappropriation of AllRounds' trade secret and confidential information.

84.     Defendants' actions in misappropriating AllRounds' trade secret and confidential information were willful, fraudulent, malicious, and was done with the intent to injure and oppress AllRounds and improve Defendants' own economic opportunities, thereby justifying an award of punitive damages against Defendants pursuant to Cal. Civil Code section 3426.3(c) and attorneys' fees pursuant to Cal. Civ. Code § 3426.4.

85.     AllRounds is also entitled to temporary, preliminary, and permanent injunctive relief to protect its confidential information and trade secrets by 1) enjoining Defendants from using or disclosing AllRounds' trade secret and confidential information; 2) enjoining Defendants from altering or deleting AllRounds' trade secret and confidential information; and 3) requiring Defendants to turn over any and all copies of AllRounds' trade secret and confidential information to AllRounds.

## COUNT III

### Infringement of Patent No. 8,046,295
### (Against Carta)

86.     AllRounds incorporates and re-alleges each and every allegation above as if fully set forth herein.

87.     The '295 patent, entitled "Private Capital Management System and Method," was duly and lawfully issued on October 25, 2011.  A true and correct copy of AllRounds' '295 patent is attached as Exhibit A.

88.     AllRounds is the owner of all rights, title, and interest in the '295 patent, including the right to bring this suit for injunctive relief and damages.

89.     The '295 patent is valid and enforceable.

90.     AllRounds has marked its products with the '295 patent since it issued, and has also listed the '295 patent on its website since it issued.  https://www.allrounds.com/about.

91.     Carta has infringed, and continues to infringe, literally and/or through the doctrine of equivalents, one or more claims of the '295 patent, including but not limited to claim 1, pursuant to 35 U.S.C. § 271(a), by making, using, selling, offering to sell, and/or importing within the United

States, without authority, products that are covered by one or more claims of the '295 patent. These products include, but are not limited to Carta for Private Companies, Carta for Venture Capital, and/or CartaX, alone or in combination ("Accused Products").

92.     In addition to directly infringing the '295 patent, Carta has indirectly infringed and continues to indirectly infringe one or more claims of the '295 patent, including at least claim 1, by actively inducing others to directly infringe the '295 patent in violation of 35 U.S.C. § 271(b). Specifically, and in light of the knowledge of the '295 patent by Carta (at least by the filing of this Complaint), Carta knowingly induced infringement of the '295 patent with specific intent to do so by its activities relating to the sales and offers to sell its Accused Products to its purchasers, and by instructing and encouraging purchasers to operate and use those products in an infringing manner with knowledge that these actions would infringe the '295 patent.

93.     Carta has also contributed to infringement of the '295 patent by others by selling or offering to sell products that constitute a material part of the '295 patent claimed inventions, that are especially made and/or adapted for infringing the '295 patent and are not staple articles of commerce suitable for substantial non-infringing use and that have been sold to purchasers who infringe the '295 patent. Specifically, and in light of the knowledge of the '295 patent by Carta as previously alleged, Carta had knowledge that its products were specifically made and/or adapted for infringement of the '295 patent and are not staple articles of commerce suitable for substantial non-infringing use.

94.     For example, Carta has infringed, and continues to infringe, at least claim 1 of the '295 patent:

> 1. A computer-implemented data processing system comprising:
>
> a data storage system that receives and stores financial information regarding capitalization and financial performance of companies, the capitalization including equity securities and debt securities issued by the companies and traded in private capital markets, the investors having ownership interests in the equity securities and the debt securities; and
>
> a processor and computer-readable media, having instructions stored therein that when executed by the processor cause the processor to implement capital management logic, the capital management logic being accessible to a plurality of users by way of a communication network, the plurality of users including companies, institutional investors, individual investors, and exchanges, the capital management logic being configured to facilitate pre-financing and post-financing transactions and other interactions between the companies, the institutional investors, the individual investors,

and the exchanges throughout one or more rounds of financing of the companies, the capital management logic being configured to track the capitalization and financial performance of the companies.

95.     The Accused Products have a computer-implemented data processing system.  For example, the Accused Products, such as Carta for Private Companies and Carta for Venture Capital, provide an "all-in-one platform" that can receive and output various data.  https://carta.com/investors/; *see also, e.g.,* https://carta.com/private-companies/.  As another example, Carta alleges that CartaX is "[t]he first vertically integrated market ecosystem for private equity[.]"  https://cartax.com/.

96.     The Accused Products have or are used with a data storage system that receives and stores financial information regarding capitalization and financial performance of companies, the capitalization including equity securities and debt securities issued by the companies and traded in private capital markets, the investors having ownership interests in the equity securities and the debt securities.  For example, the Accused Products provide for or work with a data storage system that receives and stores information regarding financial performance of companies, such as "revenue and net income" and "cash balance," as required in Carta for Private Companies and Carta for Venture Capital (https://support.carta.com/s/article/financing-history-page), or such as "data on scores of private companies" and "key financial metrics," as required in CartaX (https://www.ft.com/content/d52b0487-b13c-4bae-bf27-770518ff083d;

https://www.tradingandinvestmentnews.co.uk/silicon-valley-start-up-carta-plans-private-stock-exchange-to-rival-nasdaq/).

97.     As another example, the Accused Products provide for or work with a data storage system that receives and stores information regarding capitalization.  https://support.carta.com/s/article/exporting-the-cap-table.   The capitalization includes equity securities such as preferred stocks (labeled as "PS" in the Accused Products), as well as debt securities such as convertible notes (labeled as "CN" in the Accused Products).  *Id.*  These securities are issued by companies, such as "Meetly" as illustrated by the Accused Products.  *Id.*  The securities are traded in the private capital markets through the "Transaction" tab and as further detailed below. *Id.*  As a further example, the Accused Products, such as CartaX, offers "[s]eamless cap table integration,"

allowing individual and institutional investors to have access to companies' capitalization information. https://cartax.com/.

98.     The Accused Products have or make use of a processor and computer-readable media, the computer readable media having instructions stored therein that when executed by the processor cause the processor to implement capital management logic, the capital management logic being accessible to a plurality of users by way of a communication network, as is evidenced by the "all-in-one platform" that can receive and output various data offered by the Accused Products. https://carta.com/investors/; *see also, e.g.,* https://carta.com/private-companies/. The same limitation is further met by CartaX, which Carta alleges is "[t]he first vertically integrated market ecosystem for private equity[.]"  https://cartax.com/.

99.     The Accused Products involve the plurality of users including companies, institutional investors, individual investors, and exchanges.  For example, the Accused Products, such as Carta for Private Companies and Carta for Venture Capital, allow for companies and investors to complete "a tender offer or secondary with a third party buyer" "through the Carta feature." https://support.carta.com/s/article/transfer-shares.  Moreover, the Accused Products involve exchange users, including Carta Securities, LLC.  For example, the Accused Products, such as Carta for Private Companies and Carta for Venture Capital "transact[] $140 million+ in option exercises, repurchases, and tender offers per month."  https://carta.com/carta-vs-shareworks/.

100.     As a further example, the Accused Products, such as CartaX, which Carta alleges is "[t]he first vertically integrated market ecosystem for private equity," https://cartax.com/, allow for "[an] issuer (i.e., company) [to] exercise controls on the auction configuration," where "the auctions can be accessible by *any institutional investor* on the buy side and *anyone on the cap table* on the sell side."     https://tribecap.co/1-trillion-in-equity-how-carta-is-set-to-unlock-the-private-markets/ (emphasis in original).  The Accused Products, such as CartaX, also involve exchange users.  As Henry Ward, Carta's CEO, stated, "[i]f CartaX wins, in 10 years there won't be a NYSE or a Nasdaq." https://www.ft.com/content/d52b0487-b13c-4bae-bf27-770518ff083d; *see also* https://cartax.com/ ("CartaX: More than a trading platform"); https://capital.com/silicon-valley-start-up-carta-looks-to-

launch-private-share-trading-platform (describing CartaX as "a private share trading platform that [Carta] hopes will be a credible alternative to leading stock exchanges.").

101.     The Accused Products have capital management logic being configured to facilitate pre-financing and post-financing transactions and other interactions between the companies, the institutional investors, the individual investors, and the exchanges throughout one or more rounds of financing of the companies.  For example, the Accused Products have the capital management logic that is configured to facilitate pre-financing transactions, such as due diligence, between the companies, the institutional investors, the individual investors, and the exchanges throughout one or more rounds of financing of the companies, allowing Carta's users to "quickly respond to inquiries during the due diligence process" and "alleviat[e] a buyer's concerns."  https://carta.com/blog/how-carta-helps-with-m-a/.

102.     As another example, the Accused Products have the capital management logic that is configured to facilitate pre- and post-financing transactions, such as secondary transactions, between the companies, the institutional investors, the individual investors, and the exchanges throughout one or more rounds of financing of the companies, where "[p]articipants review offers, sign docs, and transact all through Carta."  https://carta.com/private-companies/liquidity/.

103.     As a further example, CartaX is a "secondary platform" for transaction of "private assets."     https://tribecap.co/1-trillion-in-equity-how-carta-is-set-to-unlock-the-private-markets/; https://cartax.com/.  CartaX also "[f]acilitate[s] access to disclosures and company-provided KPIs to all permissioned buyers and sellers."  https://cartax.com/private-companies/carta-cross/.

104.     The Accused Products have the capital management logic being configured to track the capitalization and financial performance of the companies, as explained above.  For example, the Accused Products track companies' financial performance, such as "revenue and net income" and "cash balance," as required in Carta for Private Companies and Carta for Venture Capital (https://support.carta.com/s/article/financing-history-page), or such as "data on scores of private companies" and "key financial metrics," as required in CartaX (https://www.ft.com/content/d52b0487-b13c-4bae-bf27-770518ff083d; https://www.tradingandinvestmentnews.co.uk/silicon-valley-start-up-carta-plans-private-stock-

exchange-to-rival-nasdaq/).   As another example, the Accused Products track companies' capitalization including equity and debt securities.  https://support.carta.com/s/article/exporting-the-cap-table; https://cartax.com/.

105.    In confirmation of the specific and concrete advancements of the AllRounds patented technologies over the prior art, Carta asserts that the patented technologies are so valuable that they will allow Carta to put the New York Stock Exchange and the Nasdaq out of existence and create the never-before-seen   ability   for   a   company   to   be   both   "private   and   liquid." https://www.tradingandinvestmentnews.co.uk/silicon-valley-start-up-carta-plans-private-stock-exchange-to-rival-nasdaq/.

106.    As the direct and proximate result of Carta's conduct, AllRounds has suffered and, if Carta's conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial. Because AllRounds' remedy at law is inadequate, AllRounds seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief. AllRounds' business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

**COUNT IV**

**Infringement of Patent No. 8,374,954**
**(Against Carta)**

107.    AllRounds incorporates and re-alleges each and every allegation above as if fully set forth herein.

108.    The '954 patent, entitled "Private Capital Management System and Method," was duly and lawfully issued on February 12, 2013.  A true and correct copy of AllRounds' '954 patent is attached as Exhibit B.

109.    AllRounds is the owner of all rights, title, and interest in the '954 patent, including the right to bring this suit for injunctive relief and damages.

110.    The '954 patent is valid and enforceable.

111.    AllRounds has marked its products with the '954 patent since it issued, and has also listed the '954 patent on its website since it issued.  https://www.allrounds.com/about.

112.    Carta has infringed, and continues to infringe, literally and/or through the doctrine of equivalents, one or more claims of the '954 patent, including but not limited to claim 1, pursuant to 35 U.S.C. § 271(a), by making, using, selling, offering to sell, and/or importing within the United States, without authority, products that are covered by one or more claims of the '954 patent.  These products include, but are not limited to Carta for Private Companies, Carta for Venture Capital, and/or CartaX, alone or in combination ("Accused Products").

113.    In addition to directly infringing the '954 patent, Carta has indirectly infringed and continues to indirectly infringe one or more claims of the '954 patent, including at least claim 1, by actively inducing others to directly infringe the '954 patent in violation of 35 U.S.C. § 271(b). Specifically, and in light of the knowledge of the '954 patent by Carta (at least by the filing of this Complaint), Carta knowingly induced infringement of the '954 patent with specific intent to do so by its activities relating to the sales and offers to sell its Accused Products to its purchasers, and by instructing and encouraging purchasers to operate and use those products in an infringing manner with knowledge that these actions would infringe the '954 patent.

114.    Carta has also contributed to infringement of the '954 patent by others by selling or offering to sell products that constitute a material part of the '954 patent claimed inventions, that are especially made and/or adapted for infringing the '954 patent and are not staple articles of commerce suitable for substantial non-infringing use and that have been sold to purchasers who infringe the '954 patent. Specifically, and in light of the knowledge of the '954 patent by Carta as previously alleged, Carta had knowledge that its products were specifically made and/or adapted for infringement of the '954 patent and are not staple articles of commerce suitable for substantial non-infringing use.

115.    For example, Carta has infringed, and continues to infringe, at least claim 1 of the '954 patent:

1. A computer-implemented data processing system comprising:

a network interface that connects the data processing system to computers associated with a plurality of users by way of a communication network, the plurality of users including companies, institutional investors, individual investors, and exchanges, the network interface receiving information from the computers including information regarding capitalization and financial performance of companies, the capitalization including equity securities and debt securities issued by the companies and traded in

private capital markets, the investors having ownership interests in the equity securities and the debt securities; and

a data storage system that receives and stores the information regarding capitalization and financial performance of companies; and

a processor and computer-readable media, the computer readable media having instructions stored therein that when executed by the processor cause the processor to implement stored capital management logic, the stored capital management logic being accessible to the plurality of users by way of the communication network, the stored capital management logic being configured to facilitate pre-financing and post-financing transactions and other interactions between the companies, the institutional investors, the individual investors, and the exchanges throughout one or more rounds of financing of the companies, the stored capital management logic being configured to track the capitalization and financial performance of the companies.

116.    The Accused Products have a computer-implemented data processing system.  For example, the Accused Products, such as Carta for Private Companies and Carta for Venture Capital, provides an "all-in-one platform" that can receive and output various data. https://carta.com/investors/; *see also, e.g.,* https://carta.com/private-companies/.  As another example, Carta alleges that CartaX is "[t]he first vertically integrated market ecosystem for private equity[.]" https://cartax.com/.

117.    The Accused Products have or work with a network interface that connects the data processing system to computers associated with a plurality of users by way of a communication network, the network interface receiving information from the computers, as is evidenced by the interactions of the users described below.    https://carta.com/investors/; *see also, e.g.,* https://carta.com/private-companies/;    https://cartax.com/;    https://cartax.com/institutional-investors/#expand-investment-opportunities.

118.    The Accused Products have a plurality of users by way of a communication network, the plurality of users including companies, institutional investors, individual investors, and exchanges. For example, the Accused Products allow for companies and investors to complete "a tender offer or secondary with a third party buyer" "through the Carta feature." https://support.carta.com/s/article/transfer-shares.  Moreover, the Accused Products involve exchange users, including Carta Securities, LLC.  For example, the Accused Products, such as Carta for Private

Companies and Carta for Venture Capital, "transact[] $140 million+ in option exercises, repurchases, and tender offers per month." https://carta.com/carta-vs-shareworks/.

119.    As a further example, the Accused Products, such as CartaX, which Carta alleges is "[t]he first vertically integrated market ecosystem for private equity," https://cartax.com/, allow for "[an] issuer (i.e., company) [to] exercise controls on the auction configuration," where "the auctions can be accessible by *any institutional investor* on the buy side and *anyone on the cap table* on the sell side."          https://tribecap.co/1-trillion-in-equity-how-carta-is-set-to-unlock-the-private-markets/ (emphasis in original).  The Accused Products, such as CartaX, also involve exchange users.  As Henry Ward, Carta's CEO, stated, "[i]f CartaX wins, in 10 years there won't be a NYSE or a Nasdaq." https://www.ft.com/content/d52b0487-b13c-4bae-bf27-770518ff083d; *see also* https://cartax.com/ ("CartaX: More than a trading platform"); https://capital.com/silicon-valley-start-up-carta-looks-to-launch-private-share-trading-platform (describing CartaX as "a private share trading platform that [Carta] hopes will be a credible alternative to leading stock exchanges.").

120.    The Accused Products have or work with a network interface that receives information from the computers including information regarding capitalization and financial performance of companies, the capitalization including equity securities and debt securities issued by the companies and traded in private capital markets, the investors having ownership interests in the equity securities and the debt securities, as well as a data storage system that receives and stores the information regarding capitalization and financial performance of companies.  For example, the Accused Products provide for or work with a network interface that receives and a data storage system that receives and stores financial information regarding financial performance of companies, such as "revenue and net income" and "cash balance," as required in Carta for Private Companies and Carta for Venture Capital (https://support.carta.com/s/article/financing-history-page), or such as "data on scores of private companies" and "key financial metrics," as required in CartaX (https://www.ft.com/content/d52b0487-b13c-4bae-bf27-770518ff083d; https://www.tradingandinvestmentnews.co.uk/silicon-valley-start-up-carta-plans-private-stock-exchange-to-rival-nasdaq/).

121.    As another example, the Accused Products further provide for "Capitalization" features which involve a network interface that receives and a data storage system that receives and stores information regarding capitalization.  https://support.carta.com/s/article/exporting-the-cap-table.  The capitalization includes equity securities such as preferred stocks (labeled as "PS" in the Accused Products), as well as debt securities such as convertible notes (labeled as "CN" in the Accused Products).  *Id.*  These securities are issued by companies, such as "Meetly" as illustrated by the Accused Products.  *Id.*  The securities are traded in the private capital markets through the "Transaction" tab and as further detailed below.  *Id.*  As a further example, the Accused Products, such as CartaX, offers "[s]eamless cap table integration", allowing individual and institutional investors to have access to companies' capitalization information.  https://cartax.com/.

122.    The Accused Products have or make use of a processor and computer-readable media, the computer readable media having instructions stored therein that when executed by the processor cause the processor to implement stored capital management logic, the stored capital management logic being accessible to the plurality of users by way of the communication network, as is evidenced by the "all-in-one platform" that can receive and output various data offered by the Accused Products, such as Carta for Private Companies and Carta for Venture Capital.  https://carta.com/investors/; *see also, e.g.,* https://carta.com/private-companies/.  The same limitation is further met by CartaX, which Carta alleges is "[t]he first vertically integrated market ecosystem for private equity[.]" https://cartax.com/.

123.    The Accused Products have the stored capital management logic being configured to facilitate pre-financing and post-financing transactions and other interactions between the companies, the institutional investors, the individual investors, and the exchanges throughout one or more rounds of financing of the companies.  For example, the Accused Products have the capital management logic that is configured to facilitate pre-financing transactions, such as due diligence, between the companies, the institutional investors, the individual investors, and the exchanges throughout one or more rounds of financing of the companies, allowing Carta's users to "quickly respond to inquiries during the due diligence process" and "alleviat[e] a buyer's concerns."  https://carta.com/blog/how-carta-helps-with-m-a/.

124.   As another example, the Accused Products have the capital management logic that is configured to facilitate pre- and post-financing transactions, such as secondary transactions, between the companies, the institutional investors, the individual investors, and the exchanges throughout one or more rounds of financing of the companies, where "[p]articipants review offers, sign docs, and transact all through Carta." https://carta.com/private-companies/liquidity/.

125.   As a further example, CartaX is a "secondary platform" for transaction of "private assets."         https://tribecap.co/1-trillion-in-equity-how-carta-is-set-to-unlock-the-private-markets/; https://cartax.com/.  CartaX also "[f]acilitate[s] access to disclosures and company-provided KPIs to all permissioned buyers and sellers." https://cartax.com/private-companies/carta-cross/.

126.   The Accused Products have the stored capital management logic being configured to track the capitalization and financial performance of the companies, as explained above.  For example, the Accused Products track companies' financial performance, such as "revenue and net income" and "cash balance," as required in Carta for Private Companies and Carta for Venture Capital (https://support.carta.com/s/article/financing-history-page), or such as "data on scores of private companies" and "key financial metrics," as required in CartaX (https://www.ft.com/content/d52b0487-b13c-4bae-bf27-770518ff083d; https://www.tradingandinvestmentnews.co.uk/silicon-valley-start-up-carta-plans-private-stock-exchange-to-rival-nasdaq/).  As another example, the Accused Products track companies' capitalization including equity and debt securities.  https://support.carta.com/s/article/exporting-the-cap-table; https://cartax.com/.

127.   In confirmation of the specific and concrete advancements of the AllRounds patented technologies over the prior art, Carta asserts that the patented technologies are so valuable that they will allow Carta to put the New York Stock Exchange and the Nasdaq out of existence and create the never-before-seen   ability   for   a   company   to   be   both   "private   and   liquid." https://www.tradingandinvestmentnews.co.uk/silicon-valley-start-up-carta-plans-private-stock-exchange-to-rival-nasdaq/.

128.   As the direct and proximate result of Carta's conduct, AllRounds has suffered and, if Carta's conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury,

and significant damages, in an amount to be proven at trial. Because AllRounds' remedy at law is inadequate, AllRounds seeks, in addition to damages, temporary, preliminary, and permanent injunctive relief. AllRounds' business operates in a competitive market and will continue suffering irreparable harm absent injunctive relief.

## JURY DEMAND

Pursuant to Civ. L.R. 3-6 and Fed. R. Civ. P. 38, AllRounds requests trial by jury for all causes of action, claims, or issues in this action that are so triable.

## PRAYER FOR RELIEF

WHEREFORE, AllRounds demands judgment against Defendants as follows:

129.   For judgment in AllRounds' favor and against the Defendants on all causes of action alleged herein against them;

130.   For preliminary and permanent injunctive relief;

131.   For judgment that this is an exceptional case;

132.   For punitive damages;

133.   For disgorgement of profits;

134.   For restitution;

135.   For costs of suit incurred herein;

136.   For prejudgment and post-judgment interest;

137.   For attorneys' fees and costs; and

138.   For such other and further relief as the Court may deem to be just and proper.

DATED:  October 9, 2020                          Respectfully submitted,

*/s/ Adam R. Alper*
Adam R. Alper (SBN 196834)
Reza Dokhanchy (SBN 287684)
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, California 94104
adam.alper@kirkland.com

1    reza.dokhanchy@kirkland.com
     Telephone: (415) 439-1400
2    Facsimile: (415) 439-1500

3
     Michael W. De Vries (SBN 211001)
4    KIRKLAND & ELLIS LLP
     555 South Flower Street, Suite 3700
5    Los Angeles, California 90071
     michael.devries@kirkland.com
6    Telephone: (213) 680-8400
     Facsimile: (213) 680-8500
7

8    Ellisen Shelton Turner (SBN 224842)
     KIRKLAND & ELLIS LLP
9    2049 Century Park East, Suite 3700
     Los Angeles, California 90067
10   ellisen.turner@kirkland.com
     Telephone: (310) 552-4200
11   Facsimile: (310) 552-5900

12
     Leslie M. Schmidt (*pro hac* to be filed)
13   KIRKLAND & ELLIS LLP
     601 Lexington Avenue
14   New York, New York 10022
     leslie.schmidt@kirkland.com
15   Telephone: (212) 446-4800
     Facsimile: (212) 446-4900
16

17   Kristina Hendricks (*pro hac* to be filed)
     KIRKLAND & ELLIS LLP
18   300 North LaSalle
     Chicago, Illinois 60654
19   kristina.hendricks@kirkland.com
     Telephone: (312) 862-2000
20   Facsimile: (312) 862-2200
21
     Attorneys for Plaintiff
22   ALLROUNDS, INC.

23

24

25

26

27

28

COMPLAINT                    29